IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| DUSTIN HOLMES,<br>    PLAINTIFF,<br><br>VS.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br>    DEFENDANT. | §<br>§<br>§<br>§  CIVIL ACTION NO. 4:11-CV-305-Y<br>§<br>§<br>§<br>§ |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

**I. STATEMENT OF THE CASE**

Plaintiff Dustin Holmes ("Holmes") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). Holmes applied for DIB and SSI on February 29, 2008, alleging that his disability began on January 13, 2006. (Tr. 49–50.)

After his application for benefits was denied initially and on reconsideration, Holmes requested a hearing before an administrative law judge ("ALJ"). (Tr. 49–52, 104.) The ALJ held a hearing on November 3, 2009, and issued an unfavorable decision on March 25, 2010. (Tr. 53–70.) On March 25, 2011, the Appeals Council denied Holmes' request for review,

leaving the ALJ's decision as the final decision of the Commissioner in this case. (Tr. 1–3.) Holmes subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA. In addition, numerous regulatory provisions govern disability insurance and SSI benefits. *See* 20 C.F.R. Pt. 404 (2012) (disability); 20 C.F.R. Pt. 416 (2012) (SSI). Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and the SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity." 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. *Id.* §§ 404.1520(b), 416.920(b). "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit." *Id.* §§ 404.1572, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. *Id.* §§ 404.1520(c), 461.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status

alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(f), 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(g), 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* §§ 404.1520(a)(4), 416.920(a)(4). At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* §§ 404.1520(e), 416.920(e).

At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings

support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III. DISCUSSION

In a single issue, Holmes challenges the ALJ's RFC finding, including the ALJ's determination that Holmes' allegations of inability to work were not fully credible, as not supported by substantial evidence. (Pl's Br. 1.) Specifically, Holmes claims that the ALJ failed to adequately consider his "heavily accommodated" work experience, medical evidence supporting his claim of disability, and testimony from his mother regarding his limitations. (*Id.*) For the reasons that follow, the Court concludes that the ALJ's decision is based upon credible evidentiary choices and medical findings and, thus, is supported by substantial evidence. *See Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1378.

#### A. Medical Evidence

In her decision, the ALJ conducted a thorough review of the administrative record and of the background and treatment history relating to Holmes' mental impairments. Holmes was born on January 13, 1988, making him eighteen years old at the time of his alleged disability onset date. (Tr. 49, 63.) As a preschooler, he was diagnosed with developmental delays and referred to special education. (Tr. 321.) He received most of his education at private schools but entered the public school system in Washington in 2006. (Tr. 471.) There, his IQ was tested and measured on the Wechsler Adult Intelligence Scale—Third Edition ("WAIS-III"). (Tr. 59, 322.) He was assessed with a verbal IQ of 79, a performance IQ of 79, and a full-scale IQ of 77. (Tr. 59, 322.) Holmes subsequently enrolled in public school in Mansfield, Texas, where school officials determined in April 2007 that he was functioning on a seventh-grade reading level and a

third-grade math level and that he qualified for special-education services. (Tr. 59, 338.) School officials noted that Holmes was "an eager student who wants to learn and do well." (Tr. 59, 338.) Holmes' art teacher reported that "he had done very well in her art class with minimal assistance" and that he was "artistically talented." (Tr. 59, 338.) The community based vocational instruction teacher reported that Holmes was "doing very well at his job site." (Tr. 59, 353.)

The ALJ examined the report of psychologist Barbara Susanne Fletcher, PsyD ("Dr. Fletcher"), who performed an independent exam of Holmes' IQ and mental status on May 2, 2008. (Tr. 59, 374–78.) Dr. Fletcher measured Holmes' IQ on the WAIS-III. (Tr. 59, 322.) Holmes scored a verbal IQ in the Low Average Intellectual Functioning range (82), a performance IQ in the Borderline Intellectual Functioning range (79), and a full-scale IQ in the Borderline Intellectual Functioning range (79). (Tr. 59, 377.) Holmes' performance on the Wide Range Achievement Test showed that he could read and spell on a seventh-grade level but that his math performance was at a fifth-grade level. (Tr. 59, 377.) Dr. Fletcher made a provisional diagnosis of Borderline Intellectual Functioning and assessed a GAF score of 55.[1] (Tr. 59, 377.)

Dr. Fletcher reported that Holmes was "polite and cooperative, verbose, and he smiled easily throughout." (Tr. 59, 374.) Holmes "cared for personal hygiene independently. He had chores and was able to complete them without problem, performed basic tasks in the kitchen, and reported that he enjoyed drawing, sketching, watching movies, and playing games." (Tr. 59,

---

[1] The Global Assessment of Functioning (GAF) scale rates psychological, social, and occupational functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) [hereinafter "*DSM-IV*"]. A GAF code of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

375.) Dr. Fletcher observed that Holmes' "responses were appropriate, he communicate[d] easily, he was respectful[,] and rapport was easily established." (Tr. 59, 375.)

The ALJ also considered a "Mental Residual Functional Capacity Questionnaire" form filled out by Dr. Diana Mummert, M.D. ("Dr. Mummert") on June 17, 2009. (Tr. 59, 487–91). At the time that Dr. Mummert completed the questionnaire, she had examined Holmes just once, on May 12, 2009.[2] (Tr. 59, 488.) Dr. Mummert diagnosed Holmes with Psychosis Not Otherwise Specified and mild mental retardation, and she assessed a GAF score of 50.[3] (Tr. 59, 488.) Dr. Mummert reported clinical findings of "fear of people, below normal intellect, isolation, bland affect, and persecutory and suspicious delusions." (Tr. 59–60, 488.) She also identified the following additional signs and symptoms: (1) persistent anxiety, (2) paranoid thinking or inappropriate suspiciousness, (3) seclusiveness or autistic thinking, (4) emotional withdrawal or isolation, (5) persistent irrational fear, (6) hallucinations or delusions, and (7) deeply ingrained, maladaptive patterns of behavior. (Tr. 489.) The ALJ accurately summed up Dr. Mummert's opinion on Holmes' ability to do work-related activities as follows:

> The doctor opined that the claimant was unable to meet competitive standard[s] of understanding and remember short[,] simple instructions. The doctor further opined that the claimant had no useful mental abilities and aptitude to perform other function[s] of unskilled work. The claimant would be expected to miss more than 4 days of work per month, and the above limitations applied since 1996.

(Tr. 60, 490–91.)

In the New Patient Assessment records from Holmes' visit with Dr. Mummert on May 12, 2009, Dr. Mummert wrote, "[Holmes] has been isolating himself recently, in his room,

---

[2] Although the ALJ stated that Holmes had "no follow up visits scheduled" with Dr. Mummert, Dr. Mummert's entry on the questionnaire actually reads, "No f/u appt yet." (Tr. 488.) Regardless, the administrative transcript does not contain any subsequent medical records showing that Dr. Mummert examined Holmes again.

[3] A GAF code of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV, supra*, at 34.

6

saying that he is [illegible] and avoiding contact with people. He is working at Sports Authority but reduced in no. of hours because he doesn't want to talk to people—afraid that they might be [illegible] and would hurt him. Denies hearing voices." (Tr. 503.) Dr. Mummert further wrote in her findings, "[Holmes] presents for symptoms of isolating himself in his room, in the dark, being afraid of interacting with people because they might hurt him." (Tr. 510.) Based on these findings, Dr. Mummert diagnosed Holmes with Psychosis Not Otherwise Specified and mild mental retardation and prescribed the psychiatric medication Abilify. (Tr. 510.)

Holmes' next psychiatry visit did not occur until four months later, on September 17, 2009, when he saw Dr. Sarah Hardy, D.O. ("Dr. Hardy") and reported that he was "doing 'okay.'" (Tr. 493.) Records from that visit show that Holmes had stopped taking the Abilify after one week due to headaches. (Tr. 494.) Holmes' subjective description of the severity of his psychiatric symptoms from his previous visit was "minimal," and he was "doing well since getting a job, Mom concurs, states she will watch him closely & return for meds if necessary." (Tr. 495.) He was noted to be "very pleasant and cooperative," and Dr. Hardy's assessment was that he "[a]ppear[ed] stable—no meds." (Tr. 495–96.)

### B. <u>Administrative Hearing</u>

Holmes testified at the hearing that he had worked as a custodian and as a stocker at a sporting goods store, after which he went to work at a library full-time. (Tr. 24.) Regarding his duties at the library, Holmes said, "I do the bookshelves. I do the stamping, the book dropping." (Tr. 24.) He testified that, before he moved to Texas, he would "use the bus," but he no longer rode the bus because his new hometown in Texas did not have a public transportation system. (Tr. 26.)

Holmes' mother testified, however, that the library job was "made up" for Holmes through the Workforce Solutions for Tarrant County's Summer Youth Employment/Paid Work

Experience program and that the job was not "a real job that he would have put his application in for." (Tr. 31, 262.) His wages were paid by the youth work program, not the library. (Tr. 32.) She testified that he would not speak to library patrons when they asked him questions and that he was afraid of learning any new skills beyond shelving books. (Tr. 31.) She explained that Holmes got the job at the sporting goods store through his high school's special education program but that he wanted only to hang clothes on racks and refused to do any work that required dealing with people. (Tr. 32.)

Holmes' mother further testified that, when Holmes is "approached to do something that's out of the norm of his job and he doesn't understand, he'll just shut down, leave. He won't say anything. He'll just shut down." (Tr. 40–41.) She testified that she had "put him in for" shelf-stocking jobs at grocery stores but that "[t]hey've red-flagged him. They said he was unhirable." (Tr. 37.) She also claimed that Holmes could not take public transportation by himself because she "couldn't trust him being out alone because he's been taken advantage of so much." (Tr. 35.) She stated that, when doctors ask Holmes if he is "doing okay," Holmes "is going to say okay because [he] says okay to everything." (Tr. 32.)

The ALJ then asked vocational expert Carol Kudala ("Kudala") whether jobs would be available to a person with a hypothetical RFC containing the following restrictions: (1) only simple, repetitive tasks, (2) no math skills, (3) occasional changes in work setting, (4) dealing with things rather than people, (5) occasional contact with people, (6) occasional supervision, and (7) no frequent production or rapid rate pace. Kudala testified that there would be over 2,300 occupations available, such as an industrial sweeper/cleaner, housekeeper, or laundry presser. (Tr. 42.) Upon questioning from Holmes' attorney about jobs available to a person who had to take "unscheduled breaks . . . where someone just walked away from their task," Kudala testified that such breaks taken "three days or more per month would lead to problems

maintaining competitive work." (Tr. 44.) Kudala also testified that she could not think of "any position that would just involve one task" and that if a person were "unable to switch tasks," he would be unable to maintain competitive work. (Tr. 45.)

### C. **ALJ Decision**

In her March 25, 2010 decision, the ALJ found that Holmes had met the disability insured status requirements of the SSA through June 30, 2010. (Tr. 58.) The ALJ then proceeded to follow the five-step sequential evaluation process. She found at the first step that Holmes had "worked and earned substantial gainful activity wages" since August 7, 2009. (Tr. 58.) But because Holmes' work was "under special conditions" designed to accommodate his mental impairments, the ALJ stated that she would not use the basis that he was engaged in substantial gainful work activity to deny his claim. (Tr. 58.)

At the second step, the ALJ found that Holmes had the severe impairments of borderline intellectual functioning and math learning disorder. (Tr. 58.) At the third step, the ALJ evaluated Holmes' severe impairments under the Listing's mental-retardation section, Listing 12.05, and found that Holmes' severe impairments did not meet or equal an impairment contained in the Listing. (Tr. 60.) Next, the ALJ performed an RFC assessment and concluded the following:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but the allegations of complete inability to work are not supported by the record. . . . [T]he claimant performed a wide range of activities of daily living which were not limited to [the] extent one would expect given the complaints of disabling symptoms and limitations. Additionally, . . . the claimant performed work activity after [the alleged onset date]. Although some work was not disqualifying substantial gainful activity and "special conditions" were reported for work at the substantial gainful activity level, the work activity strongly suggest[s] that the claimant's allegedly disabling impairment would not prevent work activity under different circumstances. Limitations have been assessed to the claimant's residual functional capacity. However, the claimant's allegations of being totally precluded from work-related activities are not fully credible, to the extent alleged."

(Tr. 62.) The ALJ found that Holmes retained the physical functional capacity to perform "a full range of work at all exertional levels." (Tr. 62.) The ALJ further found that, "[f]rom the mental standpoint, [Holmes] retains the ability to perform simple, routine, repetitive work" that involved "dealing with things rather than people," with the following restrictions: (1) occasional changes in work setting, (2) occasional interactions with crowds, the public, and coworkers, (3) occasional supervision, (4) no use of math skills, and (5) no production or rapid rate pace. (Tr. 62.)

The ALJ specifically addressed Dr. Mummert's answers given on the "Mental Residual Functional Capacity Questionnaire" and explained why she found them unsupported by the record as a whole:

> The doctor had a very brief history with this claimant and apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. The doctor failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor's opinion and the Global Assessment of Functioning assessed contrasts sharply with the other evidence of record, which renders them less persuasive.

(Tr. 63.)

The ALJ then found at the fourth step that Holmes had no past relevant work. (Tr. 63.) She proceeded to the fifth step and found that, considering Holmes' age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Holmes could do. (Tr. 64.) Therefore, the ALJ determined that Holmes was not disabled and had not been under a disability at any time through the date of the decision. (Tr. 64.)

### D. Holmes' Challenge to Credibility and RFC Findings

Holmes raises several challenges to the ALJ's reasoning underlying the RFC assessment and conclusion that Holmes' allegations of inability to work are not supported by the record and

are not credible. In essence, Holmes argues that he cannot perform jobs that exist in significant numbers in the national economy because he isolates himself, cannot deal with people appropriately, and cannot learn new tasks or switch between tasks, and the ALJ erred in concluding otherwise. (Pl.'s Br. at 11, 14; Pl.'s Reply Br. at 8.)

Holmes contends that the ALJ erroneously rejected Dr. Mummert's opinions reported on the "Mental Residual Functional Capacity Questionnaire" as unsupported by the record. (Pl.'s Br. 12.) While Dr. Mummert was technically Holmes' treating physician, she saw him only one time. Her diagnosis of psychosis and clinical findings of "fear of people, below normal intellect, isolation, bland affect, and persecutory and suspicious delusions" were based on this single visit. (Tr. 488.) Dr. Fletcher, who also examined Holmes in a single visit approximately a year earlier, did not note any observations that Holmes feared people, isolated himself, or had delusions. Dr. Fletcher administered two mental achievement tests to Holmes, and she did not report that he "shut down," refused to answer, or attempted to leave. To the contrary, he was "polite and cooperative, verbose, and he smiled easily," and his "responses were appropriate, he communicate[d] easily, . . . and rapport was easily established." (Tr. 374–75.)

When Holmes finally returned to the mental health clinic four months after seeing Dr. Mummert, the physician who examined him noted that he was not taking the medication prescribed by Dr. Mummert, yet still appeared stable. Holmes said he was doing "okay" and his symptoms were "minimal," and his mother concurred that he was "doing well since getting a job." (Tr. 493–95.) Accordingly, the Court cannot say that the ALJ erred in concluding that Dr. Mummert's opinion of the severity of Holmes' mental impairment and its restrictions on his ability to do work-related activities was less persuasive because it was inconsistent with other medical evidence in the record. *See Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (stating that the ALJ "is free to reject the opinion of any physician when the evidence supports a

contrary conclusion"); *Leggett*, 67 F.3d at 566 (stating that "the ALJ can decrease reliance on treating physician testimony for good cause," including statements "that are brief and conclusory . . . or otherwise unsupported by the evidence"). Furthermore, Dr. Mummert had a very short treatment relationship with Holmes (i.e., only one visit), which diminishes the weight of Dr. Mummert's opinion. *See* 20 CFR §§ 404.1527(c)(2), 416.927(c)(2).

Holmes also argues that, although the ALJ cited Holmes' activities of daily living as justification for the adverse credibility finding, the ALJ's characterization of Holmes' daily living activities was not accurate. (Pl.'s Br. 10.) The ALJ found that Holmes "worked, cared for personal hygiene independently, completed chores without problems, and performed basic tasks in the kitchen. He enjoyed drawing, sketching, watching movies, and playing games." (Tr. 61.) The ALJ concluded that these wide-ranging activities "were not limited to [the] extent one would expect given the complaints of disabling symptoms and limitations." (Tr. 62.) Holmes points to his mother's testimony, in which she alleged that he cannot ride the bus alone, isolates, is "unhireable," and "withdraws" when faced with new tasks, as proof that the ALJ's list of Holmes' daily activities "is not an accurate reflection of the circumstances and assistance he receives when performing those activities." (Pl. Br. 10–11.)

However, it is the ALJ's duty to evaluate the credibility and relative persuasiveness of the testimony, and this Court may neither make credibility determinations nor reweigh the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). It is the role of the Commissioner, and not the Court, to resolve conflicts in the evidence. *Id.* Furthermore, the ALJ did not base her adverse credibility finding solely on Holmes' daily activities. The ALJ also found that, even though Holmes' current job as a library worker involved "special circumstances," Holmes' work activity showed that his mental impairment "would not prevent work activity under different

circumstances"—i.e., jobs in the national economy that could be performed by a person with the limitations reflected in Holmes' RFC. (Tr. 62–63.)

Holmes argues that no "logical bridge" exists in the ALJ's reasoning that his "special and accommodated" jobs provide evidence that he can sustain a full-time job that has not been specially created for him. (Pl.'s Br. 10.) The Court recognizes the challenge inherent in determining whether a claimant can work at jobs that exist in the national economy when the claimant does not have a work history at any job involving substantial gainful activity. However, the ALJ could properly consider the skills and abilities that Holmes exhibited in his prior work experience, even though that work was "special and accommodated," when formulating Holmes' RFC. *See* 20 C.F.R. §§ 404.1573(c), 916.973(c) (stating that "work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level"). Holmes' work experience, including his experience as a merchandise stocker and a library worker, was evidence that he was capable of performing simple tasks and carrying out work-related activities on a sustained basis.

The ALJ accommodated Holmes' difficulties in interacting with people and dealing with changes in tasks in her hypothetical RFC to the vocational expert, and the vocational expert testified that there would still be over 2,300 occupations available, such as an industrial sweeper/cleaner, housekeeper, or laundry presser. (Tr. 42.) Once the Commissioner "fulfills his burden of pointing out potential alternative employment, 'the burden then shifts back to the claimant to prove that he is unable to perform the alternate work.'" *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (quoting *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)). Accordingly, a plaintiff who disputes a finding that he is capable of performing jobs identified by a vocational expert must present evidence contrary to the vocational expert's testimony. *Perez v. Barnhart*, 415 F.3d 457, 464 (5th Cir. 2005).

Even though Holmes' attorney elicited testimony from the vocational expert that there were likely no jobs available for someone who took "unscheduled breaks . . . where someone just walked away from their task" and who was "unable to switch tasks" (Tr. 44–45), there was substantial evidence in the record to support the ALJ's refusal to include these limitations in Holmes' RFC. Holmes had regularly reported to his full-time job with the library for several months, and there was no evidence that the library had fired or otherwise disciplined Holmes for walking away from his tasks or failing to perform his work. Holmes' interests and activities of daily living were varied as well. Further, although Holmes' mother claimed that he was "unhireable" and had been "red-flagged" by potential employers, her testimony does not show that she "put him in for" any jobs other than stocker positions at grocery stores. (Tr. 37.) Even if Holmes had been turned down for a grocery store stocking job, this fact does not necessarily prove that he could not perform the over 2,300 occupations identified by the vocational expert.

This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's but may only review the record to evaluate whether substantial evidence supports the Commissioner's decision. *See Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383. To reverse the Commissioner's decision, the Court must determine that no credible evidentiary choices or medical findings support the decision. *See Boyd*, 239 F.3d at 704. After carefully reviewing the record under this appropriate standard, the Court concludes that the ALJ had sufficient evidence before her to conclude at step five that Holmes, even with his limitations, could still adjust to other types of work and perform jobs in the national economy. *See id.* (stating that substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion). Accordingly, the Commissioner's decision to deny disability benefits is supported by substantial evidence in the record as a whole. *See Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until June 8, 2012, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED May 25, 2012.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE